**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| THOMAS PARSLEY, | CASE NO. 5:21-CV-02400 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| SOCIAL SECURITY ADMINISTRATION, | <u>**MEMORANDUM OPINION & ORDER**</u> |
| Defendant. | |

Plaintiff Thomas Parsley ("Plaintiff" or "Mr. Parsley") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

application for Supplemental Security Income ("SSI").  (ECF Doc. 1, ECF Doc. 8.)  This Court

has jurisdiction pursuant to 42 U.S.C. § 405(g) and is before the undersigned pursuant to the

consent of the parties.  (ECF Doc. 10.)  For the reasons set forth below, the Court **AFFIRMS** the

Commissioner's decision.

## I.        Procedural History

Mr. Parsley filed his SSI application on January 22, 2015.  (Tr. 12, 86, 87, 159-64.)  He

alleged a disability onset date of March 1, 2012 (Tr. 12, 87, 159, 188) due to herniated discs,

lower back and left shoulder pain, depression, and post-traumatic stress disorder (Tr. 17, 87, 114,

122, 192, 1047).  After initial denial by the state agency (Tr. 114-16) and denial upon

reconsideration (Tr. 122-23), Mr. Parsley requested a hearing (Tr. 124-26).  A hearing was held

before an Administrative Law Judge ("ALJ") on September 14, 2016.  (Tr. 36-85.)  On

November 28, 2016, the ALJ issued an unfavorable decision, finding Mr. Parsley not disabled.

(Tr. 9-35.)  On October 26, 2017, the Appeals Council denied Mr. Parsley's request for review of the ALJ's decision (Tr. 1-6, 156-58.)

Mr. Parsley then filed an appeal with the United States District Court for the Northern District of Ohio, Case No. 1:17-cv-02586.  (Tr. 1153-56.)  The court reversed and remanded the Commissioner's decision on January 28, 2019 (Tr. 1117-18, 1119-51), finding that "the ALJ did not adequately explain her reasons for the weight assigned to the opinions of treating physicians Dr. Jones and Dr. Fox and the opinions of the state agency reviewing psychologists" (Tr. 1119). The Appeals Council vacated the Commissioner's November 2016 decision on March 25, 2019 and remanded Mr. Parsley's case to an ALJ for further proceedings.  (Tr. 1184-86.)

After a hearing was held on November 6, 2019 pursuant to the Appeals Council remand order (Tr. 1071-1110), the ALJ issued an unfavorable decision on December 2, 2019, finding Mr. Parsley not disabled since January 22, 2015, the date his application was filed.  (Tr. 1037-70).  Mr. Parsley filed exceptions to the ALJ's decision with the Appeals Council.  (Tr. 1029, 1265-71.)  On October 26, 2021, the Appeals Council found no reason to assume jurisdiction, making the ALJ's December 2, 2019, decision the final decision of the Commissioner.  (Tr. 1029-35.)  Mr. Parsley then filed the pending appeal.  (ECF Doc. 1.)

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Mr. Parsley was born in 1976.  (Tr. 45, 159, 1063.)  At the time of the November 2019 hearing, he was living with his girlfriend of four years and her three teenagers.  (Tr. 1077-78.) He completed two and one-half years of college studying nursing.  (Tr. 46, 1079.)  His past work included three different hospital jobs: admitting clerk, nursing assistant, and patient transporter. (Tr. 1081-83.)   He started working as an Uber and Lyft driver in mid-2018 and continued in that

job through at least November 2019, working two to three nights each week for shifts ranging from thirty minutes to four hours.  (Tr. 1042-43, 1079, 1083-87, 1089-91.)

**B.     Medical Evidence**

      **1.     Relevant Treatment History**

            **i.     Physical Impairments**

In May 2014, Mr. Parsley's primary care physician at MetroHealth Medical Center ("Metro") David C. Jones, M.D., referred him to the Physical Medicine & Rehabilitation Clinic ("PM&R Clinic") for an evaluation regarding his chronic pain.  (Tr. 515-16.)  Mr. Parsley presented to Kermit W. Fox, M.D. at Metro's PM&R Clinic on May 27, 2014 for consultation regarding his low back pain.  (Tr. 512-15.)  He reported a history of back pain starting in late 2003 when he injured himself at work.  (Tr. 512.)  After no improvement with physical therapy, he underwent a L5-S1 laminectomy/discectomy in 2004 with improvement for about six months until his pain returned following incidental bending at work.  (*Id.*)  He had multiple injections and attended physical therapy following surgery.  (*Id.*)  He also had a cyst removed in 2008 from his nerve root without relief.  (*Id.*)  He reported that since 2008 he had been to multiple doctors, received an occasional injection, and received a lot of narcotics.  (*Id.*)  He settled his workers' compensation claim in 2012.  (*Id.*)  He also reported that he was assaulted in 2012, injuring his left shoulder and increasing his back pain.  (*Id.*; *see also* Tr. 240.)  He did not need surgery for his left shoulder and reported that his left shoulder was "doing rather well."  (Tr. 512.)  The primary source of his pain was in his low back.  (Tr. 512-13.)  He reported trying the following medications: Cymbalta, Celebrex, Motrin, Effexor, and Methadone.  (Tr. 513.)  He stated he had been on Methadone for a while, indicating it was "life changing compared to other opiates - less side effects."  (*Id.*)  He also used Voltaren gel, which he said provided modest relief.  (*Id.*)  There

3

was no tenderness over the bilateral lumbosacral paraspinals and minimal paraspinal spasm on examination. (Tr. 514.) Mr. Parsley's range of motion in the spine was moderately decreased with concordant pain at flexion end ranges, but there was no pain with the combination of extension and rotation. (*Id*.) His hip range of motion was normal with no pain at end range internal and external rotation. (*Id*.) There was a slump in the right lower limb, and decreased sensation to light touch and temperature in the L5 and S1 right lower limb dermatomes. (Tr. 515.) Except for decreased ankle dorsiflexion, great toe extension, and plantarflexion on the right, his muscle strength was normal. (*Id*.) His reflexes were normal. (*Id*.) Dr. Fox diagnosed: failed back syndrome, lumbar; lumbar radiculitis; and displacement of lumbar intervertebral disc without myelopathy. (*Id*.) Dr. Fox recommended a lumbar spine MRI, electrodiagnostic study for right L5 versus S1 radiculopathy, medication, physical therapy, and daily home exercises. (*Id*.)

Mr. Parsley's lumbar spine MRI was performed on August 6, 2014. (Tr. 607-608.) The impression was: "Right L4 nerve roots compression secondary to a L4-5 lateral disc. Postsurgical changes at L5-S1 with granulation tissue surrounding both left and right S1 nerve roots." (Tr. 608.) The electrodiagnostic study was performed on October 14, 2014. (Tr. 482, 485.) It showed right L5 radiculopathy and some evidence of S1 compromise. (Tr. 482, 485.)

During a follow up on October 21, 2014, Dr. Fox recommended a caudal epidural steroid injection and a neurosurgical consult. (Tr. 4845-86.) Dr. Fox continued to recommend physical therapy. (Tr. 486.) He recommended that Mr. Parsley continue with his current medication regimen, including Cymbalta, Effexor, Diclofenac gel, Baclofen, Lamictal, and Methadone, but also encouraged Mr. Parsley to wean off opiates. (TR. 485-86.)

On November 6, 2014, Mr. Parsley presented to James K. Liu, M.D., a physician with Metro's Department of Neuroscience.  (Tr. 476-480.)  Mr. Parsley reported a history of back and right leg pain.  (Tr. 477.)  He reported increased right leg pain after falling three months earlier while playing with his dog.  (*Id*.)  Physical examination findings were generally normal except he exhibited some decreased strength (4+) in the right knee with extension, flexion and dorsiflexion, a positive straight leg raise, and an antalgic gait.  (Tr. 479.)  Dr. Liu observed that a prior MRI showed a far lateral L4/5 disc herniation and scar tissue at the L5/S1 foramen, but he did not think that the disc herniation was the cause of Mr. Parsley's symptoms because he showed "symptoms of neurogenic claudication effecting the right L5 nerve root.  (Tr. 480.)  Dr. Liu recommended that Mr. Parsley continue with conservative treatment of physical therapy and epidural steroid injections "[g]iven the relative acute nature of his recent symptoms."  (*Id*.)

During a follow-up visit with Dr. Fox on December 16, 2014, Mr. Parsley reported minimal improvement in his low back pain since receiving a caudal injection on November 19, 2014.  (Tr. 462.)  He reported a few days of very mild pain relief following the injection.  (*Id*.)  He reported some improvement in his mobility and core strength after four physical therapy sessions, but no change in his pain levels.  (*Id*.)  Physical examination findings were similar to those noted in May 2014 (Tr. 514-15), but Dr. Fox indicated the examination revealed allodynia over the dorsum of the foot and discoloration (Tr. 465, 466.)  Dr. Fox continued to diagnose: failed back syndrome, lumbar; lumbar radiculitis; and displacement of lumbar intervertebral disc without myelopathy.  (Tr. 466.)  He continued to recommend a conservative course of treatment, which included a transforaminal epidural steroid injection at the right L5 and S1 area, medications, physical therapy, a home exercise program, and follow up with neurosurgery.  (*Id*.)  Mr. Parsley was encouraged to wean off opiates.  (*Id*.)

Mr. Parsley attended a primary care office visit on May 7, 2015 with his mother.  (Tr. 732.)  Dr. Jones noted that Mr. Parsley's mother was not aware of his poor follow through with treatment, and she expressed interest in her son receiving home physical therapy and mental health treatment because his anxiety was keeping him almost homebound.  (*Id*.)  Mr. Parsley reported that his pain was still significant but "much improved."  (*Id*.)  Dr. Jones noted some overall improvement in pain, but also noted that Mr. Parsley's improvement had been hampered by his lack of follow through.  (*Id*.)  He was willing to prescribe home therapy, psychology, and psychiatry subject to any necessary approvals.  (*Id*.)  Dr. Jones continued Mr. Parsley's pain regimen, which consisted of Methadone, Percocet, Cymbalta, Lamictal, Mobic, and Baclofen; he noted that there was a desire to remove Percocet.  (*Id*.)

In anticipation of closing his outpatient practice in July 2015, Dr. Jones referred Mr. Parsley to Michael D. Harrington, M.D. with Metro's Palliative Care department for prescription of narcotic medications.  (Tr. 997-98.)  Dr. Jones indicated in a May 27, 2015 letter that he had treated Mr. Parsley for chronic pain and more specifically low back pain since 2013.  (Tr. 997.)  Dr. Jones further indicated that Mr. Parsley's pain and treatment had been complicated due to significant depression, PTSD, and anxiety with elements of agoraphobia.  (*Id*.)  He explained that Mr. Parsley's pain had been treated with high potency narcotics and physical therapy.  (Tr. 997-98.)  He also explained that Mr. Parsley had been unable to, but needed to, wean off narcotics, which was the initial goal when he was transitioned to Methadone.  (*Id*.)

Mr. Parsley presented to Dr. Harrington on June 1, 2015 for a palliative care consultation regarding assumption of his Methadone treatment.  (Tr. 727-30.)  He reported that his pain was mostly in his right leg, which he described as throbbing, aching, and constant, and worse with any prolonged position.  (Tr. 728.)  He reported he was exercising more, and said the pool, hot

6

tub, and medication helped.  (*Id*.)  However, he also reported that his weight was up, he made

poor food choices, and he was not active.  (*Id*.)  His neurological examination showed that his

reflexes, sensation, motor strength, fine motor coordination, and gait were normal.  (Tr. 730.)

Dr. Harrington diagnosed radicular pain of the right lower extremity, chronic pain, and failed

back syndrome.  (*Id*.)  He noted: "Functionally this is the best he has done and pain management

wise on this regimen so no reason to stop or alter it as has a sig disease[.]  Goal of this therapy is

to allow him to be more active to lose weight[.]"  (*Id*.)  Dr. Harrington also indicated that Mr.

Parsley's depression and PTSD impaired his ability to try to move forward and cope with his

pain and debility.  (*Id*.)

Mr. Parsley returned to pain management with Dr. Fox on June 2, 2015, reporting

ongoing pain.  (Tr. 723-27.)  He admitted he had not followed up with neurosurgery or followed

through with a lumbar injection in December, noting transportation problems and some anxiety.

(Tr. 723-24.)  He reported attending seven physical therapy sessions and doing some pool

therapy on his own.  (*Id*.)  He said his medications were reasonably helpful and he was using a

TENS unit.  (Tr. 723.)  Mr. Parsley's examination findings and diagnoses were unchanged from

his prior visit with Dr. Fox.  (*Compare* Tr. 726-27 *with* Tr. 465-66.)  Dr. Fox encouraged him to

follow up with neurosurgery and to consider an epidural steroid injection after that follow up.

(Tr. 727.)  He continued Mr. Parsley's medications and encouraged him to wean off opiates.

(*Id*.)  Dr. Fox also suggested that Mr. Parsley consider a home exercise program and a possible

sympathetic blockade depending on the degree of allodynia.  (*Id*.)

Mr. Parsley returned to neurosurgeon Dr. Liu for follow up on June 15, 2015.  (Tr. 776-

77.)  He reported increased mobility due to therapy since his last office visit in November 2014,

but also reported worsening pain.  (Tr. 776.)   He indicated that his pain remained in his lower

back into his right leg.  (*Id*.)  He ambulated with a cane.  (*Id*.)  His gait was antalgic on

examination, and he had a positive straight leg raise on the right.  (*Id*.)  His strength was normal

in all extremities, except strength in his right knee was decreased (4+) with extension, flexion,

and dorsiflexion.  (*Id*.)  His sensation was intact to light touch and pinprick.  (*Id*.)  His reflexes

were normal.  (Tr. 776-77.)  Dr. Liu diagnosed lumbar spondylosis.  (Tr. 777.)  Dr. Liu again

noted that it did not appear that Mr. Parsley's right L4/L5 far lateral disc herniation was the

source of his pain.  (*Id*.)  Dr. Liu advised that "given [Mr. Parsley's] major concern [was] back

pain, surgical intervention [had] a low likelihood of effectiveness for his symptoms." (*Id*.)  He

did not recommend surgery, instead recommending physical therapy and pain management.  (*Id*.)

Mr. Parsley returned to palliative care with Dr. Harrington on August 14, 2015.  (Tr. 782-

84.)  He had lost ten pounds since his June 1, 2015 visit.  (Tr. 783.)  He continued to report pain,

but indicated that his regimen was good, and he was "keeping functional." (*Id*.)  He reported that

spasms were still a problem.  (*Id*.)  He had a positive straight leg raise on examination.  (*Id*.)  His

upper and lower extremity reflexes were normal with "downgoing plantar responses." (*Id*.)  His

sensation in all dermatomal regions was normal.  (*Id*.)  His fine motor coordination was normal.

(*Id*.)  His motor strength was normal in all myotomal regions, and his gait was normal.  (*Id*.)

There was no clonus.  (*Id*.)  Dr. Harrington noted the following diagnoses: radicular pain of the

right lower extremity, chronic pain, failed back syndrome, PTSD, depression, and obesity.  (Tr.

783-84.)  Dr. Harrington advised Mr. Parsley that he could increase his Percocet to help him

through the night.  (Tr. 784.)  Dr. Harrington also advised Mr. Parsley to wean off Baclofen for

five days and then start Tizanidine for spasms.  (*Id*.)

Mr. Parsley presented to Jeffrey Rosenberg, M.D. at Metro on September 22, 2015 for

transfer of care regarding his low back pain / failed back syndrome and elevated blood pressure,

usually worse with pain.  (Tr. 790-794.)  Mr. Parsley also reported significant anxiety and

possible PTSD.  (Tr. 790.)  He also reported that he could not watch his diet because he was on

food stamps.  (*Id*.)  He reported he was in the process of applying for disability.  (Tr. 793.)  He

was using a cane.  (*Id*.)  Examination revealed central and right lumbar tenderness with some

right lumbar paraspinal tightness.  (*Id*.)  With respect to Mr. Parsley's failed back / chronic low

back pain, Dr. Rosenberg recommended that he continue with his present management and

follow up with Dr. Harrington in three months.  (Tr. 794.)

Mr. Parsley returned to Dr. Rosenberg on February 23, 2016 for follow up regarding his

hypertension; he also requested a disability examination.  (Tr. 832-35.)  His weight was down,

and he reported improved control of his hypertension.  (Tr. 832, 833.)  Examination findings

were unremarkable.  (Tr. 834.)  Dr. Rosenberg referred Mr. Parsley to PMR for a disability

examination.  (*Id*.)

Mr. Parsley returned to Dr. Harrington on April 22, 2016.  (Tr. 857-860.)  He reported

that he was down to using Methadone twice a day.  (Tr. 858.)  He also reported that Cymbalta

was helping with his PTSD and mood.  (*Id*.)  Neurological examination findings were unchanged

from his August 2015 visit.  (*Compare* Tr. 859 *with* Tr. 783.)  Dr. Harrington observed that there

was no reason to stop or alter Mr. Parsley's current pain management regimen because was

"doing a great job of taking his health care in his own hands and losing weight and increasing

[his] strength" and "activity," and he had "simultaneously cut down his [M]ethadone."  (Tr. 859.)

However, Dr. Harrington switched him back to Baclofen for spasms because Tizanidine had

caused him anxiety.  (*Id*.)

Mr. Parsley returned to Dr. Fox for follow up on May 17, 2016.  (Tr. 907-14.)  He stated

he needed a disability assessment.  (Tr. 907.)  He reported losing 55 pounds with diet and

walking for exercise.  (*Id*.)  He reported that his endurance and mobility had improved, but he also reported that he had constant pain.  (*Id*.)  He reported being able to walk around his block three times, which took him 45 minutes, and he was swimming three times per week.  (*Id*.)  Dr. Fox observed that Mr. Parsley was returning to see him after one year and noted that he had decreased his pain medications because he had intentionally lost 50 pounds and there had been some improvement in his ability to walk distances but, overall, Parsley reported minimal subjective changes in his pain levels, and he was applying for disability.  (Tr. 913.)  Dr. Fox noted they would schedule a time to complete the disability evaluation.  (Tr. 913-914.)

Mr. Parsley saw Dr. Rosenberg on June 6, 2016 for a follow up regarding his hypertension and a cyst on his ear.  (Tr. 919-21.)  He reported that he was working on his diet and exercise and lost 15 pounds since his last visit.  (Tr. 919.)  He also reported that he was "[o]verall doing well" with his back.  (*Id*.)  He was on less Methadone and following with PM&R and Dr. Harrington.  (*Id*.)

Mr. Parsley returned to Dr. Fox on June 14, 2016 for completion of the disability evaluation.  (Tr. 927-935.)  Dr. Fox performed a physical examination.  (Tr. 932-33.)  The neuro-upper examination showed: grossly intact sensation to light touch and temperature; normal and symmetric strength; normal and symmetric muscle tone throughout without clonus; and normal and symmetric reflexes.  (Tr. 932.)  The musculoskeletal-upper examination showed: symmetry without atrophy; moderately decreased range of motion with bilateral lateral bending and bilateral lateral rotation with concordant pain at end ranges.  (*Id*.)  The musculoskeletal-lower examination showed: symmetry without atrophy; moderately decreased range of motion in the spine with concordant pain at flexion end ranges; and normal hip range of motion.  (Tr. 933.)  The neuro-lower examination showed: slump in the right lower limb with concordant right lower limb pain; decreased sensation to light touch and temperature in the L4-S1 right lower limb dermatomes; allodynia over the dorsum of the foot and discoloration of the foot; normal and

10

symmetric muscle tone; decreased strength through the right lower limb; and normal and symmetric patellar and Achilles reflexes with toes down-going on the bilateral sides. (*Id*.)  Dr. Fox provided his estimate of Mr. Parsley's functional capabilities, which are more fully set forth in Section II.B.2.i.b *infra*.

Mr. Parsley returned to Dr. Harrington on September 19, 2016 and December 23, 2016. (Tr. 1414-17, 1429-32.)  Neurological examination findings were unchanged from his April 2016 visit. (*Compare* Tr. 1416, 1431 *with* Tr. 859.)  Mr. Parsley's weight was up in December due smoking cessation.  (Tr. 1430.)   Mr. Parsley also returned to Dr. Rosenberg in December 2016. (Tr. 1421-23.)  He reported that his back pain had worsened since falling out of his bed after a nightmare, and that the increased pain was driving up his blood pressure.  (Tr. 1421-22.)  He was using a cane and requested a heating pad.  (*Id*.)  His weight was up, but his treatment notes also reflect that that he was less active in cooler weather, and had quit smoking for four months.  (Tr. 1421, 1422, 1423.)  He reported he was continuing to work on his diet and exercise.  (Tr. 1423.)

Mr. Parsley returned to Dr. Harrington on March 6, 2017 and June 8, 2017.  (Tr. 1437-40, 1457-58, 1564-66.)  Neurological examination findings were unchanged from his last visit. (*Compare* Tr. 1439, 1564 *with* Tr. 1431.)

Mr. Parsley saw Sean McMillin, DPM at Metro on July 5, 2017 regarding a callus on his left foot and his right foot drop.  (Tr. 1571-75.)  He exhibited reduced strength in the right foot on examination and reduced, but pain free, range of motion in the right ankle joint.  (Tr. 1574.) There was no pain on palpation to the right foot.  (*Id*.)  Dr. McMillin recommended a custom orthotic for the right foot.  (*Id*.)

Mr. Parsley returned to Metro's PM&R Clinic on July 6, 2017.  (Tr. 1579-86.)  He saw Travis Cleland, D.O. and Krista Stanton, D.O.  (*Id*.)  His medications at that time included

Methadone, Percocet, Mobic, and Cymbalta.  (Tr. 1580.)  He reported using a cane for ambulation and stretching daily.  (*Id*.)  His physical examination showed: decreased cervical and lumbar lordotic curvature, decreased neck and back range of motion, tenderness in the cervical and lumbar spine, normal strength and sensation in the left extremities, weakness and decreased sensation in the right extremities, normal reflexes, negative straight leg test and slump test bilaterally, positive diffuse pain bilaterally during facet grind test bilaterally, and antalgic gait.  (Tr. 1584-85.)  Drs. Cleland and Stanton diagnosed failed back syndrome, radicular pain of the right lower extremity, chronic right-sided low back pain with right-sided sciatica, and neck pain.  (Tr. 1585.)  They recommended cervical and lumbar MRIs, a referral to neurosurgery for an updated surgical opinion following imaging, and continued medication management with Dr. Harrington.  (Tr. 1586.)  If surgery was not indicated, they indicated that a referral for a spinal cord stimulator trial would be considered.  (*Id*.)

Mr. Parsley returned to Dr. Harrington on September 13, 2017 and December 18, 2017.  (Tr. 1591-94, 1607-11.)  Neurological examination findings in September were unchanged from his last visit.  (*Compare* Tr. 1593 *with* Tr. 1564.)  He reported losing weight again and that doing so was a "huge help to his pain."  (Tr. 1594.)  As with past examinations, his December examination noted a positive straight leg raise test on one side with no clonus.  (Tr. 1610.)  He was using medication, a TENS unit, and stretching to help his pain and spasms.  (Tr. 1610, 1611.)  Dr. Harrington made some medication adjustments and noted that a goal for March was to lower the Methadone and Percocet doses.  (Tr. 1610.)

Mr. Parsley continued his treatment with Dr. Harrington through at least mid-2019.  (Tr. 1481-85 (June 18, 2018), Tr. 1501-04, 1506 (September 21, 2018), Tr. 1512-17 (December 17, 2018), Tr. 1524-29 (March 4, 2019), Tr. 1471-75 (April 19, 2019), Tr. 1535-39 (June 14, 2019).)

Mr. Parsley continued to lose weight and reduce the amount of his medications.  (Tr. 1474, 1484-85, 1504, 1513, 1515, 1527-28, 1536, 1538.)   Examination findings were generally unchanged from prior findings.  (Tr. 1474, 1484, 1504, 1515, 1527, 1538.)  In September 2018, he reported he moved in with his girlfriend and started driving for Uber and Lyft.  (Tr. 1503.)  He reported that it was "working out pretty well."  (Tr. 1503.)   He reported being more active, walking more, and his weight was down four pounds.  (*Id*.)   In March 2019, he reported that his pain increased when he was without his psychiatric medication.  (Tr. 1525.)  He reported some issues getting those medications refilled, but said the issue with refills was resolved and he was doing better.  (*Id*.)  He was still working for Uber and Lyft when he saw Dr. Harrington in June 2019.  (Tr. 1535.)  He reported he was part-time and pushing himself more.  (*Id*.)  He continued to work on losing weight and walking more.  (*Id*.)

Mr. Parsley also continued to see Dr. Rosenberg through at least mid-2019.  (Tr. 1493-95, 11549-51.)  In September 2018, his physical examination revealed trace edema in the lower extremities.  (Tr. 1495.)  When he saw Dr. Rosenberg the following year in July, there was no edema present in the extremities on examination.  (Tr. 1551.)

### ii.      Mental Health Impairments

Mr. Parsley received mental health treatment at Metro by Sheerli Y. Ratner, Ph.D., starting with a mental health assessment in September 2013.  (Tr. 328-34.)  His chief complaints were PTSD and depression.  (Tr. 328.)  Dr. Ratner diagnosed depression, noting a history of physical abuse by a family member.  (Tr. 333.)  Mr. Parsley continued treatment with Dr. Ratner through at least March 2015.  (Tr. 271-72, 295-96, 313-14, 449-52, 460-61, 486-87, 502-03, 510, 518, 521-22, 532-33, 647-717.)

13

Throughout the course of his treatment with Dr. Ratner, Mr. Parsley was depressed and anxious and sometimes struggled with leaving his house. (*See e.g.,* Tr. 371-72, 313-14, 333, 502, 510, 647-48.) During an October 2014 counseling session, he reported getting upset while waiting and telling a woman to stop being rude. (Tr. 681.) He said the woman became verbally abusive towards him, and he was shaky. (*Id*.) On examination, he presented as depressed but cooperative with a full affect. (Tr. 682.) In March 2015, he reported that he had been shaking a lot and only left his house for food and medication. (Tr. 647.) He also reported he was sleeping a lot and lacked motivation to do anything productive. (*Id*.) On examination, Mr. Parsley was sleepy, tired, and restless at times (*see e.g.*, Tr. 314, 333, 450, 659), but usually cooperative and adequately groomed (*see e.g.*, Tr. 272, 296, 460, 486, 502, 510, 518, 522, 533) including during the March 2015 session (Tr. 648). His memory, concentration, and attention were generally sustained and/or within normal limits. (*See e.g.,* Tr. 272, 314, 450, 502, 522, 648.)

Mr. Parsley's records during this period reflect suicidal ideation and at least one report of attempted suicide. He reported suicidal thoughts during a January 2, 2015 counseling session, but Dr. Ratner found there was no imminent risk at that time. (Tr. 461.) During the same session, Mr. Parsley reported going on a date with a really nice nurse who he had known for a number of years. (Tr. 460.) The following month, Mr. Parsley reported he had attempted suicide by overdose in December, but no longer had suicidal ideation. (Tr. 446.) He also reported that he had talked to his psychiatrist about the incident. (*Id*.) Although Mr. Parsley was no longer actively suicidal, Dr. Jones made an additional psychiatric referral. (*Id*.) Dr. Jones also increased Mr. Parsley's Risperdal dose. (*Id*.)

Mr. Parsley resumed mental health treatment in 2016. (Tr. 1293.) He had a psychiatric evaluation at ViaQuest in February 2016, but failed to attend appointments on March 17 and April 8, 2016. (Tr. 1304-07.) He met with Monica Szleszynski, MSW, LSW, a ViaQuest provider, in his

14

home on April 19, 2016 for an Adult Diagnostic Assessment.  (Tr. 1293-1303, 1308.)  He reported making progress in the past with therapy and that his symptoms worsened when he stopped therapy. (*Id*.)  He said he struggled with managing symptoms of anxiety, panic attacks, and low self-esteem. (*Id*.)  He also reported a history of avoiding public places because of past abuse and high anxiety when he left his home (*id*.) and difficulty attending appointments due to his anxiety (Tr. 1297).  He reported past suicidal ideation and a past suicide attempt, but he denied current plan.  (Tr. 1299.)  He said he experienced a panic attack the month before when he attended a concert.  (Tr. 1300.)  LSW Szleszynski observed that Mr. Parsley presented with symptoms of anxiety, depression, and PTSD, and she felt he would benefit from counseling and psychiatric services.  (Tr. 1301-02.)

Plaintiff participated in counseling sessions with LSW Szleszynski in his home through August 2016.  (Tr. 1312-19, 1324-29, 1333-36, 1359-64.)  He also treated with psychiatric nurse practitioners Kate Boldon, Sarah Mobley, and Cassandra Skul in April, July, and November of 2016 for medication management.  (Tr. 1310-11, 1331-32, 1366-68.)  On April 26, 2016, he reported to NP Boldon that he felt depressed and had PTSD symptoms, including hypervigilance, isolation, avoidance of trigger, nightmares, and flashbacks.  (Tr. 1310.)  His last suicidal thoughts occurred three weeks earlier when his dog passed away.  (*Id*.)  He also reported recently getting a new puppy, which had helped with his depression.  (*Id*.)  He denied irritability and anger.  (*Id*.)  His medications included Lamictal, Cymbalta, and Prazosin.  (*Id*.)  NP Boldon added Buspar and increased his Prazosin to help with his nightmares.  (*Id*.)  During an appointment with NP Mobley in July 2016, Mr. Parsley continued to report symptoms of depression and PTSD, but also reported decreased incidents of suicidal ideation, fewer and less intense nightmares, and a supportive girlfriend.  (Tr. 1331.)  He reported positive benefit from Buspar.  (*Id*.)  NP Mobley increased his Buspar and Cymbalta.  (*Id*.)  When he met with NP Skul in November 2019, he reported increased depression.  (Tr. 1366.)  He had fewer nightmares but continued to have

flashbacks from the assault by his uncle. (*Id*.) He reported decreased motivation and anhedonia. (*Id*.) He also reported mood swings related to increases in his pain. (Tr. 1367.) He said his girlfriend was helpful, supportive, and caring. (*Id*.) He continued to report intermittent thoughts of death and could not deal with the pain, but he had no plan or intent. (*Id*.) NP Skul increased his Buspar, continued his Lamictal, Cymbalta, and Prazosin, and started him on Melatonin. (*Id*.)

Mr. Parsley continued to receive psychiatric treatment at ViaQuest in 2017. When he saw NP Skul on January 9, 2017, he reported that he was helping with his girlfriend's teenage children, which was stressful for him. (Tr. 1371.) He also reported increased depression associated with the shorter and colder days and chronic pain, crying spells, nightmares, and anxiety about leaving his house. (*Id*.) NP Skul increased his Lamictal and Cymbalta and continued all his other medications. (Tr. 1372.) The following month, he reported increased depression because his dog died unexpectedly. (Tr. 1374-75.) He reported that his relationship with his girlfriend was good and supportive. (Tr. 1375.) He did not want any medication changes and NP Skul made no changes. (*Id*.) NP Skul adjusted his medications in April (Tr. 1378) and May (Tr. 1381).

Mr. Parsley reported increased stressors during a June 26, 2017 appointment with NP Skul. (Tr. 1385.) He was having car problems and his girlfriend was not working due to an injury. (*Id*.) NP Skul increased his Prozac and Minipress and indicated that they would consider adding Seroquel. (*Id*.) The following month, he reported his mood improved after increasing Prozac. (Tr. 1387.) He reported that his nightmares had decreased to two nights per week. (*Id*.) His thoughts of death had decreased, and he felt less hopeless. (*Id*.) He reported decreased social anxiety and was able to go to a movie. (Tr. 1388.) He also reported that he was planning

to go out to eat for his birthday and to a concert.  (*Id*.)  NP Skul increased his Minipress for nightmares and continued his other medications.  (*Id*.)

When Mr. Parsley saw NP Skul on October 10, 2017, he reported he was doing "quite well." (Tr. 1390.)  He described his mood as "improved" and said his energy and motivation were "somewhat improved."  (*Id*.)   His relationship with his girlfriend was going well.  (*Id*.)

Mr. Parsley returned to NP Skul on January 16, 2018.  (Tr. 1397-1400.)  He reported his two biggest issues were nightmares and increased depression.  (Tr. 1398.)  He reported having a difficult time over the Christmas holiday due to a strained relationship with his mother and because it was the anniversary of his brother's death.  (*Id*.)  He was hesitant to make changes to his medications.  (*Id*.)  He was informed and upset to learn that services were being discontinued due to realignment.  (*Id*.)  NP Skul referred him to Charak Center ("Charak"), and recommended that he continue with his current medications as tolerated.  (Tr. 1399.)  His medications at that time included Prozac for depression, Lamictal for mood stabilization, Melatonin for sleep, Minipress for nightmares, Cymbalta for depression, and gabapentin for pain management.  (*Id*.)

Mr. Parsley returned to LSW Szleszynski on May 25, 2018.  (Tr. 1401-12.)  She recommended that he continue with counseling through ViaQuest and noted that he was referred out for psychiatry to help with medication management.  (Tr. 1412.)

Mr. Parsley started treatment at Charak in late 2018, and returned to Issac Bofah, CNP for follow up on February 2, 2019.  (Tr. 1618 (noting that Mr. Parsley was last seen on November 29, 2018).)  He reported that he had been without medication since December and his nightmares, depression, and anxiety had worsened.  (*Id*.)  He stated that he was unable to get back in sooner because he was in the process of moving.  (*Id*.)  Prazosin, Prozac, and Melatonin were prescribed.  (Tr. 1618, 1622.)

He returned to Charak on February 21, 2019 for medication management with physician assistant Lara Adams.  (Tr. 1626.)  He expressed frustration with frequent provider changes.  (*Id*.)  He reported taking Cymbalta for neuropathy and Methadone for pain as prescribed.  (*Id*.)  He reported that his mood was improving, but he still had issues with depression.  (*Id*.)  He stated that his depression was worse in the winter because it was hard for him to leave his house and he was in more pain.  (*Id*.)  His Prozac and Prazosin were increased, and therapy was recommended.  (Tr. 1626, 1628.)

Mr. Parsley returned to PA Adams on March 20, 2019.  (Tr. 1631.)  He reported that he continued to have nightmares, but they were not as bad, his mood was improving with the start of spring, and he rated his depressive symptoms mild to moderate.  (*Id*.)  He reported having occasional panic attacks with leaving his house, which were dependent on the day.  (*Id*.)  He also reported being able to go to the movies, but said he almost did not go due to heightened anxiety about leaving his house.  (*Id*.)  He said he was able to leave his house with the use of marijuana.  (*Id*.)  His Prazosin was increased.  (*Id*.)  He returned to Charak for medication management and case management services on April 15, 2019.  (Tr. 1638, 1643.)  His Melatonin was increased.  (Tr. 1641.)  He reported driving for Uber and Lyft.  (Tr. 1643.)

Mr. Parsley returned to CNP Bofah at Charak on May 13, 2019.  (Tr. 1648.)  He reported that he was "not doing too bad."  (*Id*.)  He reported sleep disturbances at times due to back pain.  (*Id*.)  He reported mild flashbacks, but he denied anxiety, depression, or other mental difficulties.  (*Id*.)  He was also attending counseling at Charak during May, June, and July.  (Tr. 1652, 1654, 1657.)  He returned for medication management on July 31, 2019.  (Tr. 1659.)  He reported that he was doing well, but he felt like he was "sleeping too sound and having a hard time getting up."  (*Id*.)  He reported some panic attacks and paranoia when others were behind him.  (*Id*.)  He

noted that he was also taking pain medication at night. (*Id.*) He was instructed to reduce his Melatonin dose and only take the second dose if he woke up. (Tr. 1663.) He was also instructed to take his Cymbalta, one of his pain medications, in the morning. (*Id.*) He continued with counseling in August 2019. (Tr. 1667.) He reported that his best friend was visiting, and it was a positive experience for him, but he continued to struggle with getting out of his house. (*Id.*)

During a counseling session on September 3, 2019, he reported that he had difficult clients the night before while driving for Uber/Lyft. (Tr. 1669.) He also reported familial and financial stressors, and said his sleep had not been good because of nightmares. (*Id.*) Later that month, he reported that his financial concerns had calmed down a bit, but he continued to worry about his upcoming disability hearing. (Tr. 1675.)

Mr. Parsley returned for medication management on September 27, 2019. (Tr. 1676.) He reported he was doing okay emotionally, but said he had nightmares about once a week. (*Id.*) He declined a new medication to help with his sleep because he was hesitant to start a new medication. (Tr. 1679.) He continued with counseling through November 2019. (Tr. 1680-81, 1686.) During a counseling session on November 4, 2019, he reported difficulty with sleep, nightmares, poor energy, an erratic mood, and high anxiety. (Tr. 1686.) He said he was really anxious about his disability hearing. (*Id.*) He reported he had not been able to drive for Uber since his PTSD symptoms were triggered by two of his passengers fighting with each other. (*Id.*) He also returned for medication management on November 4, 2019. (Tr. 1682.) He reported he was doing okay, but said his anxiety was high and he was having problems sleeping because of his upcoming disability hearing. (*Id.*)

### 2.      Opinion Evidence

#### i.      Physical Impairment Opinion Evidence

##### a.      Dr. Jones' Opinion

Dr. Jones completed a Medical Source Statement on June 10, 2015.  (Tr. 999-1001.)  Dr. Jones said he saw Mr. Parsley every three months since May 2013.  (Tr. 999.)  He identified the following diagnoses: chronic pain, failed back syndrome, lumbar spondylosis with facet arthropathy with nerve root compression, and depression and anxiety with agoraphobia.  (*Id*.) He identified the following symptoms: severe recurrent back pain with radicular pain complicated by significant depression and anxiety with agoraphobia, and PTSD.  (*Id*.)  He said Mr. Parsley's depression, anxiety, agoraphobia, and PTSD contributed to the severity of his functional limitations.  (*Id*.)  He also listed Mr. Parsley's medications, noting that Methadone, Percocet, and Baclofen caused sedation, dizziness, and fatigue.  (*Id*.)

Dr. Jones opined that Mr. Parsley would have the following functional capacity during an eight-hour workday:

- occasionally lift and/or carry ten pounds;

- occasionally handle and grasp, and frequently finger;

- stand for one hour at a time without interruption and stand for two hours total;

- walk for one hour at a time without interruption and walk for four hours total; and

- sit for two hours at a time without interruption and sit for four hours total.

(Tr. 1000.)  Dr. Jones also opined that Mr. Parsley would: require frequent unscheduled breaks during the workday of 10-15 minutes; be off task 20-25% of the time; and be absent at least 30% of the time due to his pain and anxiety.  (Tr. 1000-01.)

### b.    Dr. Fox's Opinion

Based on his June 14, 2016 evaluation of Mr. Parsley, which is discussed more fully in Section II.B.1.i, *supra*, Dr. Fox opined that in order for Mr. Parsley to be employable he would need a job that could accommodate the following capacity and restrictions:

- lift five pounds frequently and ten pounds occasionally;

- stand/walk for one hour in an eight-hour day;

- sit about four hours in an eight-hour day;

- sit and stand for thirty minutes before changing positions with the ability to get up and walk around for about fifteen minutes;

- ability to shift at will;

- limited ability to squat, bend, twist, reach, climb, and take stairs;

- ability to miss more than six days per month due to medical conditions;

- ability to take as many as three breaks per day lasting fifteen minutes in duration;

- no limitations in his ability to handle; and

- no environmental limitations.

(Tr. 934.)

### c.    State Agency Medical Consultants

State agency medical consultant Rannie Amiri, M.D. completed a Physical RFC Assessment on May 5, 2015.  (Tr. 93-95.)  Dr. Amiri opined that Mr. Parsley had the following physical residual functional capacity:

- occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds;

- stand and/or walk four hours in an eight-hour workday;

- sit about six hours in an eight-hour workday;

- frequently operate foot controls with the right lower extremity;

- never crawl or climb ladders, ropes, or scaffolds;

- occasionally stoop and climb ramps or stairs;

- frequently balance, kneel, or crouch;

- occasionally reach overhead with left upper extremity; and

- avoid exposure to hazards.

(*Id.*)

State agency medical consultant Venkatachala Sreenivas, M.D. agreed with Dr. Amiri's residual functional capacity opinion on reconsideration on June 23, 2015. (Tr. 107-09.)

### ii.     Mental Health Impairment Opinion Evidence

#### a.     State Agency Psychological Consultantss

State agency psychological consultant Karla Voyten, Ph.D. completed a Psychiatric Review Technique ("PRT") (Tr. 92-93) and Mental RFC Assessment (Tr. 96-98) on May 6, 2015. Dr. Voyten opined that Mr. Parsley had moderate restrictions in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace; and he had no repeated episodes of decompensation of extended duration. (Tr. 92.)  Dr. Voyten opined that Mr. Parsley had the following mental residual functional capacity:

- could understand and recall simple instructions;

- could sustain an ordinary routine with occasional prompting;

- could interact briefly and occasionally in situations that would not require more than superficial contact, resolving conflicts, or persuading others to follow demands; and

- could work in an environment where duties are fairly static.

(Tr. 96-98.)

22

State agency psychological consultant Juliette Savitscus, Ph.D. completed a PRT (Tr. 105-06) and Mental RFC Assessment (Tr. 109-11) on reconsideration on June 24, 2015.  Dr. Savitscus reached similar opinions as Dr. Voyten except with respect to Mr. Parsley's understanding and memory limitations.  (Tr. 105-06, 109-11.)  Dr. Savitscus opined that Mr. Parsley could understand and recall simple instructions with 1-3 steps (Tr. 110) whereas Dr. Voyten had opined that he could understand and recall simple instructions, with no reference to the instructions being 1-3 steps (Tr. 96).

### b.     Monica Szleszynski's Opinion

Monica Szleszynski, MSW, LSW completed a mental residual functional capacity assessment on August 22, 2016.  (Tr. 993-95.)  She reported that Mr. Parsley had been seeing her for weekly counseling sessions since April 19, 2016, and she indicated that he had been diagnosed with post-traumatic stress disorder and major depressive disorder.  (Tr. 993.)  She opined that his symptoms were severe enough to cause him to be off task more than 25% of the time.  (*Id*.)  She further opined that:

> Mr. Parsley would struggle significantly in completing an 8 [hour] workday, 5 days a week.  His symptoms result in sleep disturbances, concentration difficulty with confrontation, managing stress, excessive worry, low mood and[/]or motivation that can last for several days.

(*Id*.)  She estimated that he would be absent from work 50% of the time because:

> His anxiety would affect his concentration, ability to focus or work / complete tasks in timely manner.  [Mr. Parsley] demonstrates excessive worry over being judged/scrutinized by others in his social or performance situations.  This could ultimately lead him to avoid going to work.

(Tr. 994.)  Ms. Szleszynski opined that Mr. Parsley had moderate, marked, and/or extreme limitations in his ability to perform work-related activities was moderately.  (Tr. 994-95.)

C.    **Hearing Testimony**

1.    **Plaintiff's Testimony**

i.    **September 14, 2016 Hearing**

Mr. Parsley testified in response to questioning by the ALJ and his representative at the September 14, 2016 hearing.  (Tr. 38, 43-55, 56, 58-76.)  He explained that there were some gaps in his employment history because he was dealing with a worker's compensation claim that took a long time to finalize.  (Tr. 58.)  He also said he was not able to work because he developed a lot of scar tissue around the nerve root leading to his right leg which caused weakness, he was in a lot of physical pain daily, and he suffered from agoraphobia due to his PTSD.  (Tr. 58-59.)  He rarely left his house, and usually only left to go to his mother's house, his girlfriend's house, or the grocery store late at night.  (Tr. 59.)

Mr. Parsley reported that he started receiving mental health treatment in 2013 after he was assaulted.  (Tr. 60.)  He said his PTSD and depression caused anxiety, shakiness, sweating, hopelessness, lethargy, and bouts of crying.  (Tr. 74.)  He reported that his mental health conditions and pain were so bad that he could only concentrate about 50% of the time, even on things like simple chores.  (*Id*.)  He initially received counseling services through Metro.  (*Id*.) He reported missing some appointments because he would start to have a panic attack and have to turn around and go home.  (*Id*.)  He transitioned his mental health care to ViaQuest and was receiving counseling at his home.  (*Id*.)  He said his mental health treatment also included seeing a psychiatrist for medication management.  (Tr. 60-61.)  He felt that his medication and counseling helped, but he also felt that his mental health conditions were affecting his relationships.  (Tr. 61.)  Nevertheless, he reported that he saw his mother and spoke on the phone with his father and sister in Kentucky.  (*Id*.)  He also reported he was in a relationship

with a girlfriend.  (*Id*.)  They had known each other for eighteen years, and had been in a relationship for almost a year.  (*Id*.)  They saw one another three or four days each week.  (Tr. 61-62.)  He reported not seeing friends for a few years, but occasionally connected with others on Facebook.  (Tr. 62.)  He said he was not involved in any clubs or groups and did not really have any hobbies.  (Tr. 62-63.)

Mr. Parsley discussed how his physical impairments affected his ability to work.  (Tr. 63.)  He reported weakness in his right leg and chronic pain in his lower back, right hip, and right leg.  (*Id*.)  He said he first injured his back in 2003.  (Tr. 63-64.)  Thereafter, he had a laminectomy/discectomy in April 2004, numerous injections, physical therapy, and took pain medication.  (Tr. 64.)  He then had surgery in 2008 for an arthritic cyst excision and more injections and physical therapy.  (Tr. 64-65.)  He also continued to take medication for his back pain, and he reported that he took Methadone twice a day for pain and Percocet four times a day for breakthrough pain.  (Tr. 65-66, 71-72.)  He explained that he started having problems with his right leg in 2005 (Tr. 66-67), and that he had been using a cane for about three years (Tr. 74-75).  He said Dr. Jones prescribed the cane.  (Tr. 75.)  He was supposed to use his cane as often as possible.  (*Id*.)  He reported that he usually used his cane when he was outside of his home, but said he did not use it as much as he should while he was at home.  (*Id*.)

Mr. Parsley reported that he struggled daily because of the problems with his back and leg.  (Tr. 67.)  He stated that everything – sleeping, standing, walking, sitting, carrying, and lifting – caused him pain.  (*Id*.)  He estimated being able to stand about an hour and sit for about two hours.  (*Id*.)  He reported that he had a hard time carrying and lifting even ten pounds.  (Tr. 68.)  He reported being able to do some light cooking and wash dishes for about ten or fifteen minutes at a time.  (*Id*.)  His girlfriend's children helped him carry laundry into the basement.

25

(Tr. 69.)  He reported that he had a difficult time with vacuuming and sweeping because it was too painful.  (*Id*.)  His neighbor mowed the lawn for him.  (*Id*.)  He had two dogs that he took care of with help from his girlfriend and her children.  (Tr. 45.)  He walked his dogs one at a time.  (Tr. 48.)  He explained that he was not able to walk them every day, and he would "pay for it" after walking his dogs because he would be in bad pain for a day.  (Tr. 45, 73.)  Other than spending time with his dogs, he watched television or did some things on his computer during the day.  (Tr. 70.)  He took naps at least twice each day because his medications made him very tired.  (*Id*.)  He estimated lying down about fifteen or sixteen hours each day, and did not think he could endure an eight-hour day without lying down.  (Tr. 71.)  He reported having "bad days" about 30% of the time.  (Tr. 73.)  He described a "bad day" as "pretty much sitting . . . with [his] TENS unit on all day, waiting for the clock to let [him] take [his] next pain medication."  (*Id*.)

### ii.      November 6, 2019 Hearing

Mr. Parsley testified in response to questioning by the ALJ and his representative at the November 6, 2019 hearing.  (Tr. 1077-1103.)   He reported that he recently moved in with his girlfriend of four years and her three teenaged children.  (Tr. 1078.)  He testified to "some slight improvement in [his] mental health" over the past several years, but he said his pain had remained about the same.  (Tr. 1098, 1101.)

Mr. Parsley reported no restrictions on his driver's license, but said he had a handicap placard.  (Tr. 1079-80.)  He started driving for Uber and Lyft in 2018.  (Tr. 1079, 1083-84.)  How much he worked varied and was sporadic.  (Tr. 1084-85.)  He estimated working two or three nights each week, with the length of his shifts ranging from thirty minutes to no more than four hours, with several breaks because he had to get out and walk around.  (Tr. 1079, 1084-86.)  He said he was not working more hours because he would be "down for at least two to three days

sometimes" after working four hours.  (Tr. 1090.)  He could maybe work the next day if he worked only an hour, but might only make fifty dollars, explaining that "[i]t's not as profitable as a lot of people think" when you consider you have to cover the cost of gas.  (*Id*.)  He also reported that he had not worked recently because he had a bad experience while driving passengers on Halloween.  (Tr. 1084.)  He was driving intoxicated passengers who were fighting, and it was "pretty much . . . past [his] threshold."  (*Id*.)  He testified that driving for the companies had been "something to help [him] face [his] fear of other people or even just people sitting behind [him]," and said: "I wish I could do more, but physically, I'm just not capable of it," adding "I have amazing ratings, and people . . . really like me."  (Tr. 1090-91.)

Mr. Parsley testified that he continued to have pain in his right leg and back daily that prevented him from working.  (Tr. 1087, 1098.)  He also reported that he had been having some weakness in his left leg too.  (Tr. 1098.)  He used a cane all the time for stability.  (Tr. 1098-99.)  He was treating his pain with medication and physical therapy.  (Tr. 1087, 1088.)  He reported that the amount of medication he was taking had been reduced.  (Tr. 1088.)  He was down to a maintenance dose of Methadone every day for his pain, which was "working great."  (Tr. 1088, 1101.)  He also reported taking oxycodone for breakthrough pain.  (*Id*.)  He said the medications made him drowsy and sleepy.  (Tr. 1101.)  He reported that his doctors wanted another MRI to assess his conditions, including degenerative disc disease.  (Tr. 1087, 1098.)  He estimated being able to walk about an hour and sit about two hours at a time.  (Tr. 1099-1100.)  He could lift about ten pounds.  (Tr. 1100.)  He continued to report that he had "bad days" about 30% of the time, saying on a "bad day" he would alternate between sitting in a chair with a TENS unit and lumbar pillow and lying down with heating pads, and he would use medication.  (*Id*.)

With respect to his mental health conditions, Mr. Parsley said he was seeing a therapist weekly and taking medications, including medication to help with his nightmares.  (Tr. 1089.) He reported therapy was helpful, and said his nightmares were getting "a little better."  (*Id*.) When asked about a reported "slight improvement" in his mental health symptoms, he said he had "been able to talk to people and get out the house a little more," which he was happy about. (Tr. 1101.)  He reported he was lucky to have supportive people in his life, including his girlfriend and her children.  (*Id*.)  However, he said he still had a lot of work to do.  (Tr. 1089.) He reported his problems with concentration and focus had not gotten any better and he still had flashbacks from the assault.  (Tr. 1101-02.)  He described his anxiety with dealing with people as situational and dependent on "the interaction with the individual."  (Tr. 1102.)

Mr. Parsley testified that he was physically able to care of himself, but said he did not always keep up with showering and personal hygiene because of his pain and depression.  (Tr. 1091.)  He said he and his girlfriend went shopping together, and his girlfriend did most of the cooking, but he helped her with it.  (Tr. 1091-92.)  He needed help from his girlfriend and her children with the laundry because he was unable to bend down to get the laundry in and out of the washer.  (Tr. 1092.)  He tried to help with other chores, like wiping down counters.  (*Id*.)  He reported having a hard time walking the dogs because of worsening weakness in his leg.  (*Id*.) He helped by driving his girlfriend's children places and spent time with them going to the movies and lunch.  (Tr. 1092-94.)  He also reported that he visited with his parents.  (Tr. 1094.) He helped take care of his girlfriend's mother before she passed away, explaining that he stayed up with her through the night to help her if she needed anything; but if she needed to be moved or turned, he woke his girlfriend's son to help.  (Tr. 1095.)

Mr. Parsley testified that his depression caused him to lose interest in activities that he once enjoyed, like playing video games. (Tr. 1096-98.) But he did watch movies with his girlfriend's children and occasionally played games with them on their phones. (Tr. 1097.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the November 6, 2019 hearing. (Tr. 1103-09.) Relying on testimony from the prior hearing, the ALJ identified Mr. Parsley's past work as: admitting clerk (semi-skilled, sedentary as generally performed and as actually performed), nursing assistant (semi-skilled, medium as generally performed, but very heavy as actually performed), and patient transporter (unskilled, medium as generally performed, but very heavy as actually performed). (Tr. 1081-83, 1104.)

The VE testified that an individual of Plaintiff's age, education and work experience, with the functional limitations described in the ALJ's RFC determination, could not perform Mr. Parsley's prior work, but could perform representative positions in the national economy, including table worker, final assembler, and sorter. (Tr. 1104-06.)

The VE testified that there would be no work available if an individual with the functional limitations described in the ALJ's RFC determination was also limited to one- to three-step instructions, needed occasional prompting to sustain a routine, and could only have brief, occasional superficial contact with others. (Tr. 1106.) He testified that there would also be no work available if an individual with the functional limitations described in the ALJ's RFC determination was only able to work a six-hour workday, needed to change positions every thirty minutes and get up to walk around for fifteen minutes away from his workstation, or needed three unscheduled fifteen-minute breaks during the workday. (Tr. 1107-08.)

The VE testified that there would be no work available if an individual was capable of occasional lifting and carrying ten pounds but: limited to standing one hour at a time for a total of two hours in an eight-hour workday; limited to walking one hour at a time for a total of four hours in a workday; limited to sitting two hours at a time for a total of four hours in a workday; would need frequent breaks of ten to fifteen minutes during the workday; and would be off task 20% of the time and absent from the workforce 30% of the time.  (Tr. 1106-07.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed

30

impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In her December 2, 2019 decision, the ALJ made the following findings:[1]

1.    The claimant has not engaged in substantial gainful activity since January 22, 2015, the application date.  (Tr. 1042.)

2.    The claimant has the following severe impairments: other and unspecified arthropathies, spine disorder, obesity, affective disorder, and anxiety disorder.  (Tr. 1043.)

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 1043-46.)

4.    The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.967(b), except lift and carry, push and pull occasionally 20 pounds, frequently 10 pounds, stand and/or walk for 4 hours out of an 8 hour workday, sit for 6 hours out of an 8-hour workday; can frequently operate foot controls with the right lower extremity; occasionally climb ramps and stairs; never climb ladders, ropes, or

---

[1] The ALJ's findings are summarized.

scaffolds; frequently balance, kneel, and crouch; occasionally stoop; never crawl; can perform occasional left overhead reaching; never be exposed to hazards, such as unprotected heights; limited to perform simple, routine tasks; have occasional interaction with supervisors, coworkers, and the public; and is limited to routine workplace changes.  (Tr. 1046-63.)

5.  The claimant is unable to perform any past relevant work.  (Tr. 1063.)

6.  The claimant was born in 1976 and was 38 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  (*Id*.)

7.  The claimant has at least a high school education and can communicate in English.  (*Id*.)

8.  Transferability of job skills is not material to the determination of disability.  (Tr. 1064.)

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including table worker, final assembler, and sorter.  (*Id*.)

Based on the foregoing, the ALJ determined that Mr. Parsley had not been under a disability, as defined in the Social Security Act, since January 22, 2015, the date the application was filed.  (Tr. 1065.)

## V.  Plaintiff's Arguments

Mr. Parsley argues that the ALJ's decision is not supported by substantial evidence because the ALJ did not adequately evaluate the medical opinion evidence when assessing his RFC.  (ECF Doc. 8, pp. 1, 16-20.)  With respect to his physical impairments, Mr. Parsley asserts that the ALJ did not properly evaluate opinions provided by treating physicians Dr. Jones and Dr. Fox.  (*Id*. at pp. 1, 16-18.)  With respect to his mental health impairments, Mr. Parsley asserts the ALJ unreasonably concluded that the state agency psychological consultants' opinions that he would need occasional prompting and be limited to superficial contact with others in the workplace were inconsistent with the record evidence.  (*Id*. at pp. 1, 18-20.)

32

# VI.    Law & Analysis

## A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    First Assignment of Error: Whether ALJ Properly Weighed Opinions of Plaintiff's Treating Physicians**

Mr. Parsley argues that the ALJ's decision is not supported by substantial evidence because the ALJ "failed to provide the necessary good reasons for discounting the well supported consistent opinions of [his] treating physicians" Drs. Jones and Fox.  (ECF Doc. 8, pp. 1, 16-18.) The Commissioner asserts that the ALJ reasonably assigned little weight to the opinions of Drs. Jones and Fox and provided good reasons for doing so.  (ECF Doc. 12, pp. 14-22.)

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in the case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365,

376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). [2]

If an ALJ gives a treating source's opinion less than controlling weight, she must provide "good reasons" for the weight she assigns.  *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011).  In deciding the weight to be given, the ALJ should consider: (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen*, 478 F.3d at 747; 20 C.F.R. § 404.1527(c).

The "good reasons" provided by the ALJ "must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).  However, an ALJ is not required to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017) ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide 'good reasons' for both her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion.") (citing *Francis*, 414 Fed. Appx. at 804-804).  The Court turns to

---

[2] This case is subject to the "treating physician rule" because it was filed before March 27, 2017.  The same rule does not apply to claims field after March 27, 2017.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence* (*Revisions to Rules*), 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017) (setting forth new rules for evaluation of medical opinion evidence); *see also* 20 C.F.R. § 404.1520c.

whether the ALJ's evaluation of the opinions of Drs. Jones and Fox satisfied the regulatory framework evaluation of treating physician opinions.

### 1.    Dr. Fox's Opinion

The ALJ summarized Dr. Fox's opinion as follows:

> As noted above, on June 14, 2016, medical provider Dr. Fox opined the claimant is capable of lifting 5 pounds frequently and 10 pounds occasionally, can stand/walk 1 hour in an 8 hour workday, can sit 4 hours in an 8 hour workday, can sit and stand 30 minutes before changing position, and has to get up and walk around for 15 minutes after this (Exhibit 7F/190). Dr. Fox noted the claimant needs to shift at will, and will have limited ability to squat, bend, twist, reach, climb, and take stairs (*Id*.). He opined the claimant will probably miss more than 6 days per month due to medical conditions, and would need as many as three breaks per day of 15 minutes duration (*Id*.). Dr. Fox noted no environmental limitations or limitations in handling ability (*Id*.). Dr. Fox concluded that for the claimant to be employable, he would need a position that could accommodate these restrictions (*Id*.).

(Tr. 1060.)  The ALJ weighed the opinion and concluded: "Dr. Fox's opinion is inconsistent with the record as a whole, and therefore warrants little, rather than great or controlling, weight."  (Tr. 1061.)  In reaching this determination, the ALJ stated that the opinion did "not warrant controlling, or even great weight, for several reasons," explaining:

> First, the opinion is inadequately supported by Dr. Fox's own treatment notes, which contain consistent findings of mild distress, lumbar tenderness, minimal spasm, and moderately decreased range of motion, decreased sensation at the lumbar and right lower limb dermatomes, occasionally decreased right lower extremity strength, and allodynia and discoloration of the foot, but otherwise normal psychiatric findings, including a pleasant mood and full affect, no tenderness over the bilateral greater trochanters, normal, pain-free range of motion of the hips, normal reflexes, intact upper extremity sensation, and full upper extremity strength, which confirms greater functional capacity []. The opinion is also inconsistent with Dr. Fox's scope of conservative treatment, which has included occasional injections and recommended weaning of opiates [], with some noted treatment noncompliance []. The opinion is also inconsistent with the remaining evidence of record, including subsequent examination findings of obesity, cervical and lumbar tenderness with decreased range of motion, right sided weakness, decreased sensation, and an occasionally antalgic gait with use of a single prong cane on the left, but negative straight leg raising bilaterally, normal reflexes, no extremity edema, otherwise normal sensation and strength, normal fine motor coordination, and a generally normal gait, without noted use of an assistive

36

> device, all of which confirms greater abilities to stand, walk, sit, lift, and carry [].
> <u>The extremely restrictive opinion is also contradicted by the claimant's extensive</u>
> <u>reported activities</u>, which confirm greater functional capacities. These include
> caring for pets, working part time as a Uber driver, helping care for teenaged
> children, driving, shopping in stores, performing light household chores,
> exercising, which includes swimming at a local rec center, playing video games,
> going on dates, and going out of town to visit family members [].

(Tr. 1060-61 (emphasis added) (citations omitted).)

Mr. Parsley contends that these explanations were inadequate to supply "good reasons" to assign little weight.  First, he argues that the ALJ did not "provide any analysis to explain how Dr. Fox's opinion is inconsistent with the acknowledged abnormal findings," and did not acknowledge findings that supported the opinion, like abnormal MRI and EMG findings.  (ECF Doc. 8, p. 17 (citing Tr. 465, 608).)  On the contrary, the Court finds the ALJ did explain her reasoning.  The ALJ detailed and considered both abnormal and normal physical examination findings (Tr. 1048, 1050-53, 1060) and found Dr. Fox's extreme limitations as to sitting, standing, and position changes were unsupported by his own treatment notes, inconsistent with the conservative treatment he prescribed, and inconsistent with the record as a whole.  This finding was properly articulated and falls within the "zone of choice within which the decisionmakers can go either way, without interference by the courts."  *Blakley*, 581 F.3d at 406.

Notably, the ALJ did not ignore the MRI findings cited by Mr. Parsley, but specifically acknowledged them when detailing the objective medical evidence.  (Tr. 1051.)  The Sixth Circuit has repeatedly held that an ALJ need not reproduce a list of treatment records a second time when explaining why a treating source opinion is inconsistent with the record, so long as she "listed them elsewhere in her opinion."  *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir.

2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding no need to require the ALJ to "spell out every fact a second time").

As to the EMG findings cited by Mr. Parsley, the ALJ was not required to discuss every piece of evidence to render a decision supported by substantial evidence.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (holding an ALJ is not "required to discuss each piece of data in [her] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion") (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).  Mr. Parsley has not shown that the relevant EMG findings were inconsistent with the RFC limitations adopted by the ALJ.  Those findings showed only the possibility of "*some* degree of right S1 compromi[s]e at *some point in time*."  (Tr. 465 (emphasis added).)  Although the EMG showed "evidence of right L5 radiculopathy," there was "no clear EDX evidence of peripheral polyneuropathy of right lower extremity," and there were no active signs of denervation in the proximal L5 muscles.  (Tr. 465 (emphasis added).)  The ALJ's failure to discuss this record did not deprive her decision of substantial evidence.

Second, Mr. Parsley argues that the ALJ incorrectly found Dr. Fox's opinion was inconsistent with his "conservative treatment," because she did so without noting that he was on high potency pain medication and had two prior lumbar surgeries.  (ECF Doc. 8, p. 17.)  The ALJ did not ignore evidence regarding the types of pain medication Mr. Parsley was taking or his past lumbar surgeries.  The ALJ specifically stated: "The record indicates a history of two lumbar surgeries."  (Tr. 1057, *see also* Tr. 1047 ("claimant indicated two prior back surgeries"), Tr. 1050 (noting diagnosis of post-laminectomy syndrome), Tr. 1051 (noting diagnosis of failed lumbar back syndrome), Tr. 1052 (same), Tr. 1053 (same).)  The ALJ also repeatedly detailed pain medications prescribed and used by Mr. Parsley.  (Tr. 1048, 1049, 1050, 1051, 1052, 1053.)

38

Mr. Parsley's additional argument that the description of his treatment as "conservative" lacks evidentiary support because the record does not suggest that additional surgeries would relieve him of his pain (ECF Doc. 8, p. 17) is unavailing.  The ALJ accurately described treatment consisting of pain medications with "occasional injections and recommended weaning of opiates [], with some noted treatment noncompliance" (Tr. 1060 (citation omitted)) as "conservative."

Third, Mr. Parsley argues it was improper for the ALJ to find Dr. Fox's opinion inconsistent with his reported activities when those activities did not actually exceed Dr. Fox's stated limitations.  (ECF Doc. 8, p. 17.)  As an initial matter, the ALJ properly considered the consistency of Dr. Fox's opinion with evidence of "reported activities."  *See* 20 C.F.R. § 404.1527(c)(4); 20 C.F.R. § 404.1527(c)(6).  While "merely citing to a claimant's daily activities cannot conclusively establish an ability to engage in full-time work, it is also true that a claimant's capacity to perform tasks in daily living is a legitimate factor to be considered in assessing the claimant's functional capacity."  *Dodson v. Comm'r of Soc. Sec.*, No. 5:18-CV-02263, 2019 WL 6841771, at *3 (N.D. Ohio Dec. 16, 2019).  Mr. Parsley's contention that his activities were limited and intermittent such that they "do not require greater exertion that the limitations identified by Dr. Fox" (ECF Doc. 8, p. 17) amounts to a request to consider the evidence *de novo*, which is not an appropriate use of this Court's authority.  *See Garner*, 745 F.2d at 387.

Finally, Mr. Parsley's conclusory and underdeveloped argument that Dr. Fox's opinion is consistent with the opinion of Dr. Jones (ECF Doc. 8, p. 18) is not persuasive.  An ALJ properly looks to the entire record, not simply other medical opinions, when determining the appropriate weight to assign a medical opinion.  *Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 723–24 (6th Cir. 2004).

For the reasons set forth in more detail above, the undersigned finds that the ALJ's assignment of little weight to Dr. Fox's opinion is sufficiently explained and supported by both good reasons and substantial evidence.

### 2. Dr. Jones' Opinion

The ALJ summarized Dr. Jones' opinion as follows:

> Primary care provider David C. Jones, M.D., opined on June 10, 2015 that the claimant can occasionally lift/carry 10 pounds, occasionally handle and grasp, frequently finger, stand/walk 0 hours uninterrupted, sit 2 hours uninterrupted, stand 2 hours total, walk 4 hours total, and sit 4 hours total in an 8-hour workday (Exhibit 10F; 9F/4-6). Dr. Jones opined the claimant needs frequent, unscheduled 10 to 15 minute breaks during the workday, and would be off task 20-25% of the time and absent at least 30% of the time, likely due to pain and anxiety (Id.). Dr. Jones noted that frankly, at that point, placement in a competitive work situation would not work out well (Id.). In support of his opinion, Dr. Jones noted diagnoses of chronic pain, failed back syndrome, lumbar spondylosis with facet arthropathy and nerve root compression, and depression/anxiety with agoraphobia, with symptoms including severe recurrent back pain with radicular pain, complicated by significant depression/anxiety with agoraphobia and PTSD (Id.).  Dr. Jones noted he had seen the claimant every three months since May 2013 (Id.).

(Tr. 1058.)  The ALJ weighed the opinion and concluded: "[T]he record as a whole confirms the claimant is not as limited as set forth in Dr. Jones's opinion, and therefore the opinion warrants little, rather than great or controlling weight."  (Tr. 1060.)  In reaching this determination, the ALJ explained:

> Pursuant to the rules at issue in this case, a treating physician's medical opinion on the issue of the nature and severity of an impairment is entitled to special significance and, when supported by objective medical evidence of record, is entitled to controlling weight (20 CFR 416.927(c)(2)). On the other hand, statements that the claimant is "disabled", "unable to work," cannot perform a past job, determines the residual functional capacity, or meets a listing, are not medical opinions, but are administrative findings requiring familiarity with the Regulations and legal standards set forth within the case (20 CFR 416.927(d)). Such issues are reserved to the Commissioner, who cannot abdicate statutory responsibility to determine the ultimate issue of disability. Thus, the conclusion by Dr. Jones that placement in a competitive work situation would not work out well warrants little weight.

(Tr. 1058.)  The ALJ then explained that the "remainder of the opinion, including the severely restrictive exertional limitations and work preclusive absenteeism and off task findings contained therein, warrant[ed] little, rather than great or controlling weight" because "it [was] not well supported and [was] inconsistent with the remaining evidence of record."  (Tr. 1058-59.)  More particularly, the ALJ considered Dr. Jones' treatment records, explaining:

> While Dr. Jones' treatment notes contain evidence of anxiety, discomfort, tenderness, stable chronic back pain, left shoulder weakness and decreased range of motion, and right ankle swelling and erythema, they confirm no acute distress, normal orientation and alertness, normal reflexes, and intact sensation on examinations, which suggests greater functional capacities than those indicated by Dr. Jones []. Furthermore, although Dr. Jones treated the claimant for several years, his treatment records often contain little by way of physical examination findings, including significant noted abnormalities, and thus they fail to provide adequate support for the severe functional limitations contained in his opinion []. In addition, although Dr. Jones noted the claimant had been unable to pursue weaning, Dr. Jones confirmed the claimant's pain was admittedly relatively stable on a medication regimen, which admittedly included strong narcotic pain medication [].

(Tr. 1059 (citations omitted) (emphasis added).)  The ALJ also considered other evidence of record, stating:

> In addition, the opinion is inconsistent with the remaining evidence of record, including examinations conducted by other providers near the time the opinion was rendered, which revealed lumbar tenderness, spasm, and decreased range of motion, slightly decreased lower extremity strength, decreased sensation at the lumbar and right lower limb dermatomes, positive straight leg raising on the right, allodynia and discoloration of the foot, and an antalgic gait with use of a cane, but full upper and left lower extremity strength, normal muscle tone, normal, pain-free range of motion of the bilateral hips, otherwise intact sensation, and normal reflexes []. While the noted examination abnormalities confirm the existence of some functional limitations, findings of full upper extremity strength, normal, pain-free range of motion of the hips, and normal reflexes, indicate greater capacities to sit, stand, walk, lift, and carry, thereby confirming the claimant is not as limited as set forth in Dr. Jones' opinion.

(*Id.* (citations omitted) (emphasis added).)  The ALJ concluded her analysis by identifying her reasons for finding that Dr. Jones' opinion did not warrant controlling weight.  (Tr. 1059-60.)  Specifically, the ALJ stated:

41

[T]he opinion warrants little, as opposed to great weight, for several reasons. First, although Dr. Jones has a lengthy treating history of the claimant, his opinion is inadequately supported by his own treatment notes which, as noted above, are often absent significant noted abnormities on physical examination []. In addition, the opinion is inconsistent with the record as a whole, including more recent examination findings of persistent lumbar tenderness, decreased range of motion, decreased sensation, decreased right lower extremity strength, allodynia and discoloration of the foot, and occasionally abnormal gait with occasionally noted use of a cane, but otherwise intact sensation, full upper extremity and left lower extremity strength, negative straight leg raising, normal fine motor coordination, and a generally normal gait without noted use of an assistive device on ambulation []. The opinion is also inconsistent with the recent scope of largely conservative medical treatment, consisting primarily of primary care treatment, with decreased use of narcotics, use of a TENS unit with improvement, and no recent physical therapy []. The opinion is also inconsistent with the behavioral evidence of record, which includes examination findings of normal orientation, speech, thoughts, and memory, generally normal psychomotor activity, and sustained attention and concentration, which contradicts Dr. Jones' indications of disabling psychiatric symptoms contributing to work preclusive absenteeism and time off task []. In addition, the opinion, including the severely restrictive exertional limitations and work preclusive time off task and absenteeism provisions contained therein, is contradicted by the claimant's reported activities, which include caring for pets, working part time as a Uber driver, helping care for teenaged children, driving, shopping in stores, performing light household chores, exercising, which includes swimming at a local rec center, playing video games, going on dates, and going out of town to visit family members [].

(Tr. 1059-60 (citations omitted) (emphasis added).)

Mr. Parsley argues that "[t]he ALJ provided the same inadequate reasoning [as she did with respect to Dr. Fox's opinion] to reject the opinion of Dr. Jones," asserting that "[t]he ALJ identifies abnormal and normal physical findings but does not explain how the normal physical findings outweigh the abnormalities which are present in the record," and "[t]he ALJ further relies upon [his] activities but [his] limited, intermittent activities do not exceed the limitations contained in Dr. Jones' assessment."  (ECF Doc. 8, p. 18.)

Mr. Parsley's cursory argument mimics the arguments he raised as to Dr. Fox's opinion, and fails for similar reasons.  For the reasons articulated in Section VI.B.1., *supra*, and upon a review of the ALJ's detailed discussion and analysis of the weight given to Dr. Jones' opinion,

the Court finds the ALJ sufficiently explained her reasons for finding the opinion unsupported by treatment notes and inconsistent with the evidence.  The Court further finds the assignment of little weight to Dr. Jones' opinion to be supported by both good reasons and substantial evidence.  Mr. Parsley's first assignment of error is without merit.

**C.     Assignment of Error Two: Whether ALJ Reasonably Excluded Limitations of Occasional Prompting and Superficial Contact with Others from the Mental RFC**

In his second assignment of error, Mr. Parsley challenges the ALJ's conclusion that the state agency psychological consultants' opinions that he would need occasional prompting and be limited to superficial contact with others in the workplace were inconsistent with the record evidence.  (ECF Doc, 8, pp. 1, 18-20.)   He contends that the omission of these limitations from the RFC is serious because the VE testified those limitations would be work preclusive.  (*Id*. at p. 20.)   The Commissioner responds that the ALJ reasonably assigned partial weight to the state agency psychological consultants' opinions and appropriately found them not entirely consistent with the record.  (ECF Doc. 12, pp. 22-25.)

The ALJ found that the evidence of record supported a mental RFC as follows: "limited to perform simple, routine tasks; have occasional interaction with supervisors, coworkers, and the public; and is limited to routine workplace changes."  (Tr. 1046.)   In reaching this determination, the ALJ considered and weighed the opinions of the state agency psychological consultants.  (Tr. 1061-62.)  She assigned partial weight to their opinions, specifically concluding that a need for occasional prompting and/or a limitation to superficial contact with others was not consistent with the record as a whole and was unwarranted.  (Tr. 1062.)  After summarizing the opinions of the state agency psychological consultants, the ALJ explained her rationale for assigning partial weight, stating the two opinions were:

informed by program knowledge and took into consideration the behavioral evidence of record at the time they were rendered []. Therefore, the opinions warrant some weight. However, <u>the opinions were not based on personal evaluations of the claimant [], and did not take into consideration much of the mental health treatment notes of record [].</u> <u>Furthermore, the opinions are not entirely consistent with the record as a whole.</u> More specifically, although examinations have revealed chronic mood and affect abnormalities, a sleepy/tired appearance, and occasional restlessness, agitation, and/or tearfulness, the claimant has been consistently cooperative, with adequate to good grooming, good eye contact, normal speech, thoughts, associations, and memory, sustained attention and concentration, appropriate language, and intact insight and judgment, which confirms that a need for prompting and limitation to superficial contact with others are not warranted []. <u>In addition, the opinions, specifically the limitations related to occasional prompting and superficial interaction with others, are inconsistent with the claimant's reported activities,</u> which include driving, exercising at a rec center, caring for pets, working part time as a Uber driver, helping care for teenaged children, travelling out of town to visit family members, going on dates, and playing video games with friends []. <u>Because some of the limitations contained therein, specifically the need for occasional prompting and restriction to superficial contact with others, are inconsistent with the record as a whole, I give the opinions partial, rather than great weight.</u>

(Tr. 1061-62 (citations omitted) (emphasis added).)

As a general matter, an ALJ is charged with determining a claimant's RFC based on all the relevant evidence in the claimant's record. *See* 20 C.F.R. §§ 404.1545(a)(1); 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). In doing so, the ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding." *Poe*, 342 F. App'x at 157; *see also Modro v. Comm'r of Soc. Sec.*, No. 2:18-CV-900, 2019 WL 1986522, at *7 (S.D. Ohio May 6, 2019), *report and recommendation adopted,* No. 2:18-CV-900, 2019 WL 2437296 (S.D. Ohio June 11, 2019). Indeed, even where an opinion is given great weight, the Sixth Circuit has noted "there is no requirement that an ALJ adopt a state agency psychologist's opinion[] verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267,

275 (6th Cir. 2015).  Thus, it was not *per se* error for the ALJ to exclude some limitations from the state agency psychological consultants' opinions from the RFC.

Plaintiff contends that the ALJ's analysis is faulty and her decision to omit those limitations lacked the support of substantial evidence.  First, he contends "[t]he ALJ [did] not explain how the abnormal findings such as chronic mood, agitation, tearfulness, anxiousness, irritability and anger are inconsistent with a need for occasional prompting and superficial contact with others."  (ECF Doc. 8, p. 19.)  On the contrary, the Court finds the ALJ appropriately acknowledged the abnormal examination findings, but accurately observed that the evidence of record also included observations that Mr. Parsley was "consistently cooperative, with adequate to good grooming, good eye contact, normal speech, thoughts, associations, and memory, sustained attention and concentration, appropriate language, and intact insight and judgment."  (Tr. 1061.)  Considering both the abnormal and normal findings, the ALJ concluded that the "need for prompting and limitation to superficial contact with others [were] not warranted."  (*Id*.)  The Court finds this determination sufficiently explained, and that Mr. Parsley has not demonstrated that it lacks the support of substantial evidence.  *Jones*, 336 F.3d at 477.

Second, Mr. Parsley contends that the ALJ unreasonably found that his reported activities – including "driving, exercising at a rec center, caring for pets, working part-time as an Uber driver, helping care for teenage children, traveling out of town to visit family, going on dates and playing video games with friends" – were inconsistent with the need for occasional prompting and superficial interaction with others.  (ECF Doc. 8, pp. 19-20.)  More particularly, he asserts that "interacting with familiar others is far different from the interaction generally required in a work situation," and given his "symptoms of irritability, agitation, and anger, it was reasonable

for the state agency physicians to find that he should have only occasional superficial interaction with others." (*Id*. at p. 20.)

The Court first finds that the ALJ did not ignore evidence of symptoms that would interfere with Mr. Parsley's ability to interact with others. Indeed, the ALJ found he was moderately limited in his ability to interact with others (Tr. 1045) and limited him to occasional interaction with others (Tr. 1046). The Court also finds that the ALJ's determination that Mr. Parsley's reported activities, in conjunction with his examination findings did not warrant a limitation to superficial contact was reasonable. This is particularly true given the evidence that he worked as an Uber driver and his own testimony that he wished he could work more in that capacity and that he had "amazing ratings, and people . . . really like [him]." (Tr. 1090-91.)

Mr. Parsley also asserts that his "other identified activities do not demonstrate that he is capable of performing the activities without occasional reminders," arguing: "Presumably as an Uber driver, [he] has a GPS which provides constant reminders of where he needs to go," and "[a]s for the other activities identified, they do not require sustained concentration." (ECF Doc. 8, p. 20.) Even if Mr. Parsley used a GPS to assist him, he would nevertheless be required to maintain the attention and concentration necessary to safely drive his passengers. The ALJ also explained that the need for occasional reminders was inconsistent with examination findings, which included sustained concentration and intact insight and judgment. (Tr. 1061.) Further, the ALJ did not disregard all evidence that his symptoms might limit is ability to concentrate or remain focused, but instead determined that the evidence warranted RFC limitations of "simple, routine tasks" with "routine workplace changes." (Tr. 1046.)

The Court finds that Mr. Parsley's disagreement with the ALJ's weighing of the evidence is not a basis to remand this matter for further proceedings. The Court also finds that the ALJ's

determination that the need for occasional prompting and limitation to superficial contact with others were inconsistent with the record was sufficiently explained and that Mr. Parsley has not shown that the ALJ's determination lacked the support of substantial evidence.  Mr. Parsley's second assignment of error is without merit.

### VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

September 29, 2023

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge